## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| VS. | § | NO. 4:19CR264 |
| | § | Judge Jordan |
| GEORGE WAGNER, III | § | |

### DEFENDANT'S MOTION TO REVOKE DETENTION ORDER

NOW COMES Defendant George Wagner, III, and hereby respectfully moves this Court, pursuant to 18 U.S.C. § 3145(b), to revoke the order of detention of Defendant George Wagner, III imposed by the Honorable Judge Christine Nowak on November 6, 2019, for the reasons set forth below.

### I.     BACKGROUND

#### A. The Indictment

Defendant Wagner, is currently charged with violating 21 U.S.C. § 846, conspiracy to distribute and possess with the intent to distribute a controlled substance (Count Two) and violating 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, possession with the intent to distribute and distribution of controlled substances and aiding and abetting (Count Five). [Dkt. 30]. Defendant Wagner is not alleged to have been involved with the distribution of Alprazolam or Fentanyl which resulted in the death of Ryan Pearson, as alleged against Scott Perras, Ben Westin, and William Allbrook in Count I of the indictment. [Dkt. 30].

1

## B. The Government's Evidence

Sometime after December 2018 and into the beginning of January 2019, the Government began investigating a string of drug transactions after a young man died from a fatal overdose of drugs alleged to have been supplied by Ben Westin and Scott Perras.

Defendant Wagner's detention hearing was held in conjunction with the detention hearings for Defendants Ben Westin (the individual alleged to have delivered fatal drugs to Ryan Pearson) [Dkt. 90, at 11], Frank Dockery (the former police detective who trained several codefendants (not Wagner) in firearms and assisted in the purchase and sale of controlled substances as a police officer/detective) [Dkt. 90, at 15], and William Allbrook (the individual alleged to transport drugs for the organization who had connections in Houston) [Dkt. 90, at 97].

### i.     Defendant Ben Westin

Detective Roach testified that Pearson died at approximately 12:42 a.m. on December 28, 2018 allegedly from taking a pill or pills provided by Ben Westin. [Dkt. 90, at 17]. After Westin received a phone call from Pearson's girlfriend about what had occurred, Westin texted the address of Pearson's apartment to Defendant Dockery. [Dkt. 90, at 17]. Roach explained that Westin's reaching out to Dockery was concerning because it would serve as a way for "the organization" to obtain information about the ongoing investigation into Pearson's death. [Dkt. 90, at 17].

After the fatal overdose, Westin continued to deal drugs and appeared to have engaged in "narcotics transactions with numerous people, not only to support his own apparent drug habit, but then also for financial means." [Dkt. 90, at 20].  When the search warrant was executed on Westin's residence, agents found: "two firearms; pills, which were later determined to be counterfeit Oxycodone pills containing Fentanyl[,] Alprazolam pills . . . cocaine, marijuana, some pure THC extraction, and then a large quantity of psilocybin mushrooms as well." [Dkt. 90, at 21]. Roach testified that he believed Westin was a danger to the community because Westin was dealing Fentanyl, which was responsible for the loss of at least one death already.

ii.     Defendant Frank Dockery

With regard to Defendant Dockery, text messages revealed that he had been supplying Westin drugs while on the job as a Detective for the Plano Police Department. [Dt. 90, at 23]. Dockery's text messages revealed that he sought to train Westin, Defendant Bussell, and others to qualify and obtain a license to carry a firearm. [Dkt. 90, at 29]. Dockery agreed to help obtain a device for preventing the detection of drugs in urine tests for Bussell [Dkt. 90, at 30]; and texted Bussell that he was "trying to figure out what [he could] come up with to help" in reference to the drug investigation. [Dkt. 90, at 31].

iii.     Defendant William Allbrook

Roach testified that Defendant Allbrook was responsible for obtaining and delivering drugs to Bussell from a connection in Houston, Texas. [Dkt. 90, at 33-34]. Allbrook supplied Bussell with counterfeit Adderall pills (methamphetamine) and Oxycodone pills containing Fentanyl. [90, at 34]. An exchange of text messages between Allbrook and Bussell illustrated their "business" relationship in which they discussed drugs being purchased with counterfeit money and their "need" for a "new employee" after expressing their discontent with Defendant Austin Seymour. [Dkt. 90, at 37]. In addition to handling over $100,000 worth of drug transactions, Allbrook and Bussell had several meetings to discuss Pearson's death and possibly fleeing the country. [Dkt. 90, at 41-42].

    iv.   <u>Defendant George Wagner, III</u>

Roach testified that on July 29, 2019, Defendant Wagner received a text message from Defendant Bussell inquiring about whether he had any Adderall. [Dkt. 90, at 44]. Text messages also revealed that Wagner allegedly inquired about THC cartridges and whether Bussell knew "Molly" (street terminology for MDMA). [Dkt. 90, at 45]. Roach testified that Wagner had a prescription for Adderall and was only suspected of providing Adderall. He did not have any reason to believe Wagner was a source of supply to anyone for methamphetamine or any other drugs, namely, Fentanyl. [Dkt. 90, at 46-].

## C. Defendant George Wagner, III's Evidence

### i. Detective Roach's Cross-Examination

On cross-examination, Detective Roach confirmed that Wagner's criminal history stemmed from youthful indiscretions at the ages of 17, 18, and 20 years old, making the convictions more than twenty years old. [Dkt. 90, at 57]. Wagner was released on parole in June 27, 2005, had no violations of his parole, and was discharged from parole on April 17, 2009. [Dkt. 90, at 57-59]. No weapons were found at Wagner's residence or on his person, and Wagner was never violent—he was cooperative. [Dkt. 90, at 59].

Roach testified that Wagner did not have a large drug total, and was believed only to be a source of supply for Adderall. [Dkt. 90, at 60]. Although Wagner's text messages allegedly included an inquiry of obtaining "about 300" THC cartridges, Roach had no evidence that a large transaction of that sort ever occurred. [Dkt. 90, at 58-59].

Roach testified that he had no information that indicated Wagner was a source of Fentanyl or other counterfeit pills. [Dkt. 90, at 60]. Significantly, Roach confirmed that Wagner is not implicated in the death of Ryan Pearson. [Dkt. 90, at 60]. Roach had no information to support an inference that Wagner would flee the country, or fail to comply with any conditions if granted pretrial release. [Dkt. 90, 60-61]. Roach had no information that Wagner had any prior instances of violence for the past 14

years (i.e., since being released on parole), and agreed that had Wagner displayed any resistance or failure to cooperate during his arrest, he would have been notified.

ii.    Character Letters

Prior to presenting testimony, Wagner's counsel presented nine character references, and offered to turn over Wagner's passport upon his being granted pretrial release. [Dkt. 90, at 79]. The character letters were admitted as Document 71-1. Wagner's mother, father, and aunt were all willing to serve as third party custodians.

Wagner's boss, Charles Flanigen, verified that he has known Wagner for ten years, and described him as a "great employee and leader to the crews that he has worked with" and explained that customers frequently compliment Wagner on his work. [Dkt. 71-1, Flanigen]. Ruben Shumake has known Wagner for over 18 years. Shumake attested to the fact that Wagner has helped him "many times in my life when I needed it," and explained that Wagner helps others and would be capable of doing whatever the court required if released pending trial. [Dkt. 71-1, Shumake]. While the Government presented testimony from Roach that Shumake had been to prison on a manslaughter charge, they offered no evidence that he had engaged in any criminal activity since being released and discharged from his sentence.

Criselda Montoya wrote that she has known Wagner for over 13 years and described him as "respectful," "kind," "genuine," and "a man of his word." [Dkt. 71-1 Montoya]. Caitlin Winters, described Wagner as a father figure who attended

extracurricular activities, took her to and from school events, choir, volleyball games and tournaments, and described him as an honest and loyal individual. [Dkt. 71-1, Winters]. Wagner's late best friend's wife, "Toby Blaine," described him as always looking out for her and her girls and having a heart of gold. [Dkt. 71-1, Blaine]. Vice President and Partner of Musclegen Research, Nathan Wynn, wrote that he has known Wagner for several decades and described Wagner as "compassionate," "trustworthy," "selfless," and "a truly exceptional man." [Dkt. 71-1, Wynn].

Wagner's ex-fiance, Jennifer Lambert, described Wagner as a positive influence for her daughter Caitlyn and echoed Caitlyn's description of his involvement in her upbringing. Lambert also attributed Wagner's support as instrumental in allowing her to obtain a college degree. [Dkt. 71-1, Lambert].

Brandi Clifton, another family member/friend, wrote about how Wagner has "always held down a stable job and made sure his bills were paid." [Dkt. 71-1, Clifton] Lastly, Wendy Blaine described Wagner as "dependable, responsible, honest, and dedicated to whatever job he was working," and is the kind of person who would never knowingly do anything to harm "anyone or anything." [Dkt. 71-1, Wendy Blaine].

iii.   <u>George Wagner, Jr.'s Testimony</u>

Wagner's father, George Wagner, Jr. ("Father"), testified that while Wagner was financially stable and had a credit score of over 750, specifically 763 [Dkt. 71-2], Wagner did not have the financial resources to flee prosecution. [Dkt. 90, at 80].

Father testified that Wagner regularly pays his bills, has a regular job, does contract work for others at industrial sites, and also does work for him. [Dkt. 90, 82]. Father explained that before and after serving his prison sentence. Wagner has always lived in Dallas County. [Dkt. 90, at 82]. Father also testified that Wagner's mother lived in Garland, had an aunt that lived in Fort Worth, and another aunt, Vivian, who lived three houses away from Wagner. [Dkt. 90, at 82-83].

Father testified that Wagner had not been arrested for anything since being released on parole, and had no guns or weapons. [Dkt. 90, at 83]. Father described Wagner as friendly, soft spoken, and amicable. He testified that when Wagner was required to appear for court in his previous cases (from over 20 years ago), Wagner always appeared as required. [Dkt. 90, at 84]. Lastly, Father testified that Wagner could follow any set of conditions upon release and was willing to serve as a third-party custodian upon Wagner's release. [Dkt. 90, at 85]. Father also testified that Wagner's mother, Terry Ryals, and aunt, Vivian Wagner, were also willing to serve as third-party custodians. [Dkt. 90, at 85].

### D. Closing Arguments

In her closing argument, undersigned counsel explained that the evidence showed only text messages that Wagner was an alleged customer of Bussell who talked about giving Bussell some of his Adderall.  Wagner did not have or own guns or attend firearms training offered by Dockery; Wagner has had steady employment; was not

linked to Oxycontin, Fentanyl, or counterfeit Adderall; did not have sufficient financial resources to flee prosecution; was willing to forfeit his passport (discussed earlier in the proceeding); has significant ties to the community because all of his family lives in the DFW metroplex and has lived in Dallas County his entire free life; has never failed to appear for court hearings; and does not possess any violent or dangerous personality traits since being back in the free world.

Significantly, the Assistant US Attorney made *no mention* of Wagner in its closing argument. [Dkt 90, at 94-101].

## II.   ARGUMENT

### A. The Standard of Review

The role of a district court in reviewing detention orders is as follows: "When the district court, pursuant to 18 U.S.C. § 3145(b), acts on a motion to revoke or amend a magistrate's pretrial detention order, the court acts *de novo* and makes an independent determination of the proper pretrial detention or conditions for release." *United States v. Roy*, No. 3:12-CR-054-L, 2012 U.S. Dist. LEXIS 48371, at *2 (N.D. Tex. Apr. 5, 2012) (quoting *United States v. Fortna*, 769 F.2d 243, 249 (5th Cir. 1985)). Pretrial detention may be ordered only upon a finding that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any person and the community." 18 USC § 3142(e). The court's finding of a lack of reasonable assurance of either (1) the defendant's

appearance or (2) the safety of others or the community is sufficient; both are not required. *United States v. Perez*, No. 3:05=CR-186-L, 2005 U.S. Dist. LEXIS 23481, at *9 (Tex. N.D. Oct. 13, 2015) (citing *United States v. Rueben*, 974 F.2d 580, 586 (5th Cir. 1992), *cert denied*, 507 U.S. 940 (1993). The court must determine a lack of assurance of trial presence by a preponderance of the evidence, while a determination of a lack of assurance of community safety must be based on clear and convincing evidence. *Id.* (citing *United States v. Jackson*, 845 F.2d 1262, 1264 n.3 (5th Cir. 1988) (citing *Fortna*, 769 F.2d at 251).

## B. The Rebuttable Presumption and 3142(g) Factors

When it is alleged that a defendant has committed an offense with a maximum term of imprisonment of ten years or more under the Controlled Substances Act, it is presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds probable cause to believe that the person committed an offense. *See* 18 U.S.C. § 3142(e)(3). To rebut the presumption, the defendant must "produce some evidence that he does not present a special risk." *Fortna*, 769 F.2d at 251 (citing *United States v. Jessup*, 757 F.2d 378, 384 (1st Cir. 1985)). Wagner not only presented evidence that he does not present a "special risk" to the community, but also presented evidence that his ties to the community would provide a reasonable assurance that he would appear for his court dates and not flee from the jurisdiction.

In determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, the judicial officer shall take into consideration a number of factors as listed in 18 U.S.C. § 3142(g). Here, the evidence relating to the nature and circumstances of Wagner's involvement in the offense amounted to an alleged text message exchange in which inquiries were made about obtaining Adderall and whether Bussell "knew" "Molly." *See generally* Roach Testimony. Unlike Allbrook, Dockery, Westin, Bussell, Perras, Seymore, and Shewmake, Wagner was not alleged to have a customer base, make thousands of dollars or generate other income for drugs, or be involved n the distribution of Fentanyl or Oxycontin. When Wagner's circumstances are compared in light of the nature and circumstances of the other defendants' involvement, it is clear that whatever involvement Wagner is alleged to have had, it is nowhere near the scale of the codefendants. As a result, this factor weighs *against* finding that Wagner poses a special risk to the community and weighs *in favor of release.*

It is hard to ignore the lack of evidence the Government used against Wagner during the detention hearing when compared to the other defendants. All that the Government had was text messages—there was no evidence that Wagner ever obtained the 300 THC cartridges discussed in an alleged text message, nor was Wagner found to have been in possession of MDMA to corroborate the inferences from Wagner's

alleged text messages. Because the weight of the evidence against Wagner is light, this factor also weighs *against* a finding that Wagner poses a special risk to the community and that Wagner would not appear for any of his court hearings. As a result, this factor weighs *in favor of release.*

While Defendant Wagner's criminal history included 2 serious felonies, they occurred more than twenty-five years ago. Moreover, the fact that Wagner was released on parole and subsequently discharged with no violations supports a finding that Wagner *does not pose* a risk to the community if released. Moreover, the numerous character letters (written and provided on incredibly short notice) illustrate that Wagner's prior convictions did not define the man that he became upon his release from prison. "Kind," "protective," "great employee," "father figure," "dependable," and "honest" were among the several adjectives used to describe Wagner (and never used in a description of someone who is a danger to the community). These descriptions of Wagner's personality and demeanor weigh *against* a finding that he poses a threat to the safety to the community. Rather, the positive attributes described in the character letters weigh *in favor of release.*

With regard to community ties, Wagner's are strong. His father, his mother, stepmother, stepdaughter, and two aunts all live in the DFW metroplex. Wagner has lived and worked in the DFW-area, primarily Dallas County, ever for almost 15 years. Thus, Wagner's ties to the community weigh *against* a finding that he would not

appear for court and/or would be a threat to the safety of the community. His longstanding and strong ties to his family and friends living in the DFW metroplex weigh *in favor of release.*

Additional evidence weighing *against a finding* that Wagner posed a threat to the community was that Wagner was not on probation, parole, or other release pending trial, sentencing appeal, or completion of sentence for another offense when he allegedly committed the offense(s) in the indictment.  This factor weighs *in favor of release.*

When all of the evidence pertaining to George Wagner is considered in light of the statutory factors and presumptions, the community would actually be better served to have him released pending trial.

## C. Conclusion

When all of Wagner's evidence is considered in light of Detective Roach's testimony, Wagner has sufficiently rebutted the presumption against release. Wagner did not, nor was it ever alleged, that he handled Fentanyl. Wagner has long-standing community ties, no weapons, and steady employment. The character letters provide overwhelming support that Wagner would appear for court and comply with any conditions that may be imposed if granted release. Accordingly, it was error to find that Wagner failed to rebut the presumption that no condition or combination of conditions would reasonably assure his appearance and safety of the community.

## III.   PRAYER

For the reasons set forth above, Defendant Wagner **PRAYS** this Court will Revoke the Order of Detention and Order Defendant **RELEASED** pending trial, under whatever conditions this Court deems necessary.

Respectfully submitted,

Christie M. Merchant
Texas State Bar No. 24070219
christie@merchlaw.com
MERCHANT LAW OFFICE, PLLC
17304 Preston Road, Ste. 1250
Dallas, Texas 75252
Telephone: 214-538-7393
Facsimile: 214-594-8824

### CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing Motion has been served on November 22, 2019, via CM/ECF to AUSA Jay Combs.

Christie M. Merchant

### CERTIFICATE OF CONFERENCE

This is to certify that undersigned counsel conferenced with AUSA Jay Combs about this motion by email on November 22, 2019, and the Government is **OPPOSED**.

Christie M. Merchant

14